# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 17-80185-CV-MIDDLEBROOKS/BRANNON

ANTECH DIAGNOSTICS, INC.,

    Plaintiff,

v.

MICHAEL POSNER,

    Defendant.

_____/

## **OPINION AND ORDER**

This action was filed by Antech Diagnostics, Inc. ("Antech") against Michael Posner ("Posner") on February 15, 2017. Antech filed one claim of breach of contract against Posner based on an agreement, dated June 26, 2015, executed between Antech and Posner. On November 15, 2017, I held a bench trial at which time documentary and testimonial evidence were presented. The Parties submitted written Closing Arguments, filed on December 15, 2017. (DE 59 (Posner), DE 60 (Antech)). Based on the evidence presented, I make the following findings of fact and conclusions of law.

## **FINDINGS OF FACT**

1. Butch Allen ("Allen"), an Antech representative, testified that Antech is a California-based entity authorized to do business in Florida. (Allen testimony). It is incorporated in California and its principal place of business is also California. (*Id.*). Antech provides diagnostic laboratory services to veterinarians. (*Id.*). Antech maintains a lab in Florida. (*Id.*).

1

2. Michael Posner ("Posner") testified that he is a Florida citizen, who resides in Florida. (Posner testimony). He is a veterinarian and is the president of Mobile Vet 2U, Inc. ("Mobile Vet"). (*Id.*). Mobile Vet registered the fictitious name, "West Avenue Animal Hospital." Mobile Vet is a mobile veterinarian service designed to treat pets at clients' homes. (*Id.*). Posner decided to open West Avenue Animal Hospital ("West Avenue"), a brick and mortar veterinarian practice in Delray, Florida. (*Id.*). West Avenue opened in 2015. (*Id.*).

3. Antech provided laboratory services to MobileVet2U prior to the opening of West Avenue. When West Avenue first opened, Posner submitted lab tests to Antech under the MobileVet2U account. (*Id.*).

4. At some point in early 2015, Posner met with Patricia Pascucci, a sales representative of Antech. (*Id.*). They discussed Posner entering into an exclusive agreement whereby Posner would agree to use only Antech for external lab services for 7 years. (*Id.*).

5. Pascucci also informed Posner that he would be eligible for additional discounts for lab services if he joined Purchasing Services, Inc. ("PSI"), which is a veterinary purchasing group that obtains discounts for its members. (*Id.*). Pascucci completed Posner's application for membership with PSI on June 26, 2015. (*Id.*). She listed "Antech - Patricia Pascucci" as the referral source. (DE 51-1 at 1; Posner testimony). The handwriting on the application is not Posner's, with the exception of his signature. (*Id.*). Posner testified he was subsequently approved for and became a member of PSI. (*Id.*).

6. Antech and Posner executed an Exclusive Laboratory Services Agreement ("ELSA"), with an effective date of July 1, 2015. (DE 53-1). Posner signed the ELSA on June 26, 2015, and

Antech signed it on June 29, 2015. (*Id.*). Attached to the ELSA are two annexes. The first is titled "Annex Loan" (*Id.* at 5-7), and the second is titled "Annex Pricing and Discounts" (*Id.* at 8).

7. Annex Loan provides that Posner is the borrower and Antech is the lender. (*Id.* at 6). Posner would receive a loan in an amount of "$15,000 for a period of 7 years at an annual interest rate of 7.0%." (*Id.* at 5). If Posner satisfied the annual minimum fee amount for a given year, payed all amounts when due, and was otherwise not in default, Antech would forgive the annual loan payment for that year. (*Id.*).

8. Annex Pricing, under paragraph 2 labeled "Pricing," provides that "[t]he prices charged for Laboratory Services shall be as set forth on Antech Diagnostic's Fee Schedule, as modified from time to time for its customers generally, and in effect at the time the Laboratory Services are performed, subject to any Trade Discounts identified below." (*Id.* at 8). Paragraph 3, which is labeled "Trade Discounts," provides: "As an additional incentive for Practice Owner to enter into the Agreement, subject to the terms and conditions of the Agreement, each billing period Antech Diagnostics will provide Practice Owner a trade discount of 30% ("Trade Discount") off the Full Invoiced Amount (as defined below) for Laboratory Services for such billing period less any Excluded Items (as defined below)." (*Id.*).

9. No Fee Schedule was attached to the ELSA. (Allen testimony; Posner testimony). Butch Allen, a Zone Director for Antech, testified that had Posner requested a Fee Schedule, either the sales representative could have handed it to him or Antech could have mailed it to him. (Allen testimony).

10. In July 2015, Patricia McNamara, a representative from PSI, emailed Posner "the pricing [he]

3

requested." (DE 51-2 at 1). Attached to the email was an Antech document labeled 2015 Fee Schedule. (*Id.* at 3-28). The first set of prices was contained after the general information about Antech. (Id. at 8). It provides: "Enclosed is a copy of our new price list. We value your business and appreciate the opportunity to service you and your hospital. Antech will continue to offer discounted pricing to you on the following tests and profiles." (*Id.*). Below that language is a list of tests, followed by an "Antech List Price" and a lower "PSI Price." (*Id.* at 8-10). After the PSI price list was a larger number of tests with only one price listed. (*Id.* at 12-28).

11. Antech sent Posner his first invoice after the ELSA, dated July 31, 2015. (DE 53-3). Posner noticed that he was billed more than he expected. (Posner testimony). He immediately contacted Antech's billing department and stated that he understood he would receive PSI pricing. (*Id.*). Antech told him to contact his sales representative to correct the pricing. (*Id.*).

12. None of Posner's subsequent invoices contained PSI pricing. (DE 53-4 to 53-17). Posner testified that he continued to contact Pascucci and the billing department to correct the invoices. (Posner testimony).

13. On February 11, 2016, Pascucci emailed Posner an addendum to the ELSA for him to execute. (DE 51-5 at 1). The addendum provided that the Pricing Annex to the ELSA would be modified to provide, "The pricing charged for Laboratory Services shall be as set forth on Antech Diagnostics' PSI Fee Schedule, as modified from time to time for its customers generally, and in effect at the time the Laboratory Services are performed, subject to any discounts or special pricing identified below." (*Id.* at 2). The addendum provided that the

effective date of the addendum was September 1, 2015. (Id.).

14. Posner testified that he did not sign the addendum because the effective date was 2 months after the effective date of the ELSA. (Posner testimony).

15. On April 14, 2016, Pascucci emailed Posner again, attaching the 2016 PSI Fee Schedule (DE 51-4) but noted that "I am not able to assign these prices to your account until you have signed and forwarded Addendum . . . ." (DE 51-3).

16. Posner continued to receive monthly invoices. (DE 53-3 to 53-17). He paid some of the past due balance but did not make full payments. (*Id.*).

17. Posner received a final invoice on October 31, 2016. (DE 53-17). It provides that Posner owes Antech $22,009.16. (*Id.* at 1). Sometime after Posner did not pay that invoice, Antech ceased providing lab services. (Posner testimony). Posner then started sending his lab services to another vendor. (*Id.*).

18. Allen testified that he had no first-hand knowledge of the negotiations leading up to the execution of the ELSA between Posner and Antech. (Allen testimony). He stated that he would not have approved of the terms of the ELSA with PSI pricing. (*Id.*). However, he did not review the ELSA and approve it. (*Id.*). Pascussi is no longer employed with Antech. (*Id.*).

19. Antech presented expert testimony as to its alleged lost profits based on the termination of the ELSA in late 2016. (Reith testimony). John Reith, a certified public accountant, testified and provided an expert report (DE 53-2).

## CONCLUSIONS OF LAW

Antech contends that Posner breached the ELSA because he failed to pay the amounts he

owed under the contract ($22,898.97), and that he breached the exclusivity provision by using another company for diagnostic services. Antech seeks the value of outstanding invoices, lost profits under the ELSA, acceleration and immediate repayment of the loan, and reasonable attorneys' fees under the ELSA. Posner argues that Antech induced him to enter into the ELSA by representing it would provide the services at a substantial discount to its retail pricing, but failed to provide him the discounted pricing.

**Choice of Law.** As a diversity case, federal procedural law and the substantive law of Florida apply. *McMahan v. Toto*, 256 F.3d 1120, 1132 (11th Cir. 2001). Paragraph 10 of the ELSA contains a choice-of-law provision, which states: "This Agreement is to be governed by and construed in accordance with the internal laws of the State of California, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of California or any other jurisdiction) that would cause the application of the laws of any jurisdictions other than the State of California." (DE 5-2 at 4).

"In diversity cases, the choice-of-law rules of the forum state determine what law governs, and under Florida law, courts enforce choice-of-law provisions unless the law of the chosen forum contravenes strong public policy." *Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.*, 704 F.3d 927, 932 (11th Cir. 2013) (internal quotations and citations omitted). I am aware of no reason why enforcement of the choice-of-law provision contravenes Florida public policy, and indeed neither party has advanced that position. Accordingly, California substantive law applies to the breach of contract claim.

**Legal Standard.** Under California law, the elements of breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3)

6

defendant's breach, and (4) the resulting damages to the plaintiff. *Oasis West Realty, LLC v. Goldman*, 250 P.3d 1115, 1121 (Cal. 2011).

The parole evidence rule "provides that when parties enter an integrated written agreement, extrinsic evidence may not be relied upon to alter or add to the terms of the writing." *Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assoc.*, 291 P.3d 316, 318 (Cal. 2013). "An integrated agreement is a writing or writings constituting a final expression of one or more terms of an agreement." *Id.* (internal quotation marks omitted). *See also Alling v. Universal Mfg. Corp.*, 5 Cal. App. 4th 1412, 1434 (Cal. Ct. App. 1992) (agreement is "integrated" if it is "a complete and final embodiment of the terms of an agreement."); Cal. Code Civ. Proc. § 1856(a) (an agreement is integrated if it is "intended by the parties as a final expression of their agreement"). "A court considers several factors when determining whether an agreement is an integration: (1) the presence of an integration clause; (2) the contract's language and apparent completeness or incompleteness; (3) if a party argues another contract exists, whether that agreement's terms contradict those of the written contract; (4) whether the alleged additional agreement would naturally be made as a separate agreement; and (5) whether extrinsic evidence might confuse the jury." *Lennar Mare Island, LLC v. Steadfast Ins. Co.*, 176 F. Supp. 3d 949, 962-63 (E.D. Cal. 2016) (citing *Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 859 (9th Cir. 1995) and *McLain v. Great Am. Ins. Cos.*, 208 Cal. App. 3d 1476, 1484 (Cal. Ct. App. 1989)). The terms set forth in an integrated agreement "may be explained or supplemented by course of dealing or usage of trade or by course of performance." Cal. Code Civ. Proc. § 1856(c).

However, extrinsic evidence challenging the validity of an integrated agreement itself is not barred. *Riverisland*, 291 P.3d at 319. "Evidence to prove that the instrument is void or

voidable for mistake, fraud, duress, undue influence, illegality, alteration, lack of consideration, or another invalidating cause is admissible." *Id.* (internal quotation marks omitted). Such "evidence does not contradict the terms of an effective integration because it shows that the purported instrument has no legal effect." *Id.* (internal quotation marks omitted). "When fraud is proven, it cannot be maintained that the parties freely entered into an agreement reflecting a meeting of the minds." *Id.* at 324.

**Breach of Contract Claim.** Consideration of extrinsic evidence is proper. The ELSA is not an integrated agreement, at least as to pricing. Although the ELSA has an integration clause, other factors show that the ELSA is not integrated as to the pricing terms. The ELSA provides that, "[t]he prices charged for Laboratory Services shall be as set forth on Antech Diagnostic's Fee Schedule, as modified from time to time for its customers generally, and in effect at the time the Laboratory Services are performed." (DE 5-2 at 3) (emphasis added). There was no Fee Schedule attached to the ELSA. Thus, the price terms were not incorporated into the ELSA. The extrinsic evidence, therefore, does not contradict the express terms of the agreement, as the ELSA is silent as to the price terms. Indeed, the ELSA provides that the pricing may be "modified from time to time for its customer generally." (DE 5-2 at 3).

I find that the Parties entered into a valid and enforceable contract. Posner sought to defend against the breach of contract claim based upon fraudulent inducement, due to Ms. Pascucci's representations regarding PSI pricing which lured him to enter into the agreement with Antech. "It is well established that a defrauded defendant may set up the fraud as a defense." *Bowmer v. H. C. Louis, Inc.*, 243 Cal. App. 2d 501, 503 (Ct. App. 1966). "[A] contract induced by fraud renders the entire agreement voidable, permitting the aggrieved party to defend a suit on

8

the contract by objecting to its enforcement because procured or induced by fraud." *Filet Menu, Inc. v. C.C.L. & G., Inc.*, 79 Cal. App. 4th 852, 862 (2000). A defrauded party's right to avoid liability under the contract for fraud is lost, however, "if the injured party, after acquiring knowledge of the fraud, manifests an intention to affirm the contract." *Bowmer v. H. C. Louis, Inc.*, 243 Cal. App. 2d at 503 (internal citations omitted). In this case, Posner continued to perform under the ELSA for over a year, intending to retain the benefits of the contract. As such, he elected to affirm the contract, despite becoming aware of the fraud, and his treatment of the contract as binding resulted in an effective waiver of any claim of fraud. *Eustace v. Lynch*, 43 Cal. App. 2d 486, 491 (1941) ("The person who has been misled is required, as soon as he learns the truth, with all reasonable diligence to disaffirm the contract, or abandon the transaction, and give the other party an opportunity of rescinding it, and of restoring both of them to their original position. He is not allowed to go on and derive all possible benefits from the transaction, and then claim to be relieved from his own obligation by a rescission or a refusal to perform on his own part. If, after discovering the untruth of the representations, he conducts himself with reference to the transaction as though it were still subsisting and binding, he thereby waives all benefit of and relief from the misrepresentations." (internal quotation marks and citations omitted)).

Thus, a binding contract was formed and that contract is not voidable due to fraudulent inducement. The terms of the contract as to pricing were proven at trial through properly considered extrinsic evidence. The evidence relating to the formation of the contract established that the parties agreed that Posner would be subject to PSI pricing. Posner testified that Ms. Pascucci informed him that he would be billed at PSI prices if he applied for and became a member of PSI. Posner introduced his application with PSI, which was dated June 26, 2015, the same date

Posner executed the ELSA. The application also listed Ms. Pascucci as the referral source. This is compelling evidence that Ms. Pascucci and Posner negotiated and agreed to the PSI pricing term. Additionally, the emails between Posner and Antech show that Antech understood that PSI pricing was available and that Posner needed to correct any billing issue with his representative, Ms. Pascucci. Finally, Antech's emails to Posner transmitted a 2016 Fee Schedule, which provided two sets of prices: an Antech list price and PSI price. Thus, the evidence shows that (1) the ELSA did not have pricing attached to it; (2) Antech offered PSI pricing; (3) Ms. Pascucci informed Posner that he would be subject to PSI pricing if he became a member of PSI; (4) Posner submitted his application to PSI on the day he executed the ELSA and listed Ms. Pascucci as the referral source; and (5) after execution of the ELSA, Antech sent Posner a list of prices that included PSI prices. Thus, the contract contemplated that Posner would receive PSI pricing, and Antech first breached the contract by not honoring the agreed upon pricing terms.

To prevail in its breach of contract claim, however, Antech must prove not only the existence of a contract and a breach by Posner, but also that Antech performed under the contract (or had an excuse for its nonperformance). *See Oasis West Realty, LLC v. Goldman*, 250 P.3d 1115, 1121 (Cal. 2011). Antech did not honor the PSI pricing terms, and as a result it cannot meet its burden of proving that it performed under the contract so as to satisfy the second element of its breach of contract claim. Accordingly, judgment on this claim will be entered in favor of Posner and against Antech.

**Equitable Remedy.** Notwithstanding Antech's inability to prevail on its breach of contract claim, equity demands that Posner pay for the services provided to him by Antech, albeit at PSI pricing. Additionally, Posner must partially repay the $15,000.00 loan.

"Quantum meruit refers to the well-established principle that 'the law implies a promise to pay for services performed under circumstances disclosing that they were not gratuitously rendered.'" *Fair v. Bakhtiari*, 195 Cal. App. 4th 1135, 1150 (2011) (citing *Huskinson & Brown v. Wolf*, 32 Cal. 4th 453, 458 (2004) (internal citations omitted)). Quantum meruit is "an equitable remedy implied by the law under which a plaintiff who has rendered services benefitting the defendant may recover the reasonable value of those services when necessary to prevent unjust enrichment of the defendant." *In re De Laurentiis Entertainment Group Inc.*, 963 F.2d 1269, 1272 (9th Cir. 1992). The doctrine is based upon "the provision and receipt of benefits and the injustice that would result to the party providing those benefits absent compensation." *Id.* at 1272. So long as a plaintiff is seeking only one recovery, "it is entitled to pursue both contract claims and quantum meruit claims arising out of the same transaction." *In re DeLaurentiis* at 1272 FN 3. "To recover in quantum meruit, a party need not prove the existence of a contract, but it must show the circumstances were such that the services were rendered under some understanding or expectation of both parties that compensation therefore was to be made." *Fair* at 1150 (internal quotation marks omitted).

Posner argues that Antech cannot recover on a quantum meruit theory because it did not include a quantum meruit claim in the Complaint. Posner cites no law to support this assertion. Antech, on the other hand, fails to address this issue at all -- its closing brief presumes that equitable relief is available, without addressing the question of whether its failure to expressly seek quantum merit relief forecloses recovery from Posner.

I am aware of no authority which would preclude me from rendering a judgment which fairly disposes of this matter after carefully evaluating the evidence presented and the equitable

11

considerations involved. Indeed, the notion of reaching the result which justice requires goes to the core of this court's judicial function. This idea is embodied in Federal Rule of Civil Procedure 54, which provides that "final judgment should grant the relief to which each party is entitled, *even if the party has not demanded that relief in its pleadings.*" Fed. R. Civ. P. 54 (emphasis added). *See also Holt Civic Club v. City of Tuscaloosa,* 439 U.S. 60, 66 (1978) ("a meritorious claim will not be rejected for want of a prayer for appropriate relief"); *Western District Council v. Louisiana Pacific Corp.,* 892 F.2d 1412, 1416–17 (9th Cir.1989) (holding case not moot because court could grant remedy of rescission even though plaintiff had not requested this remedy). Moreover, it is well-established that a district court's inherent equitable powers are broad, enabling judges "to do equity and to mould each decree to the necessities of the particular case." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946) ("the comprehensiveness" of the district court's "equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." (internal quotation marks and citations omitted)).

Although Antech did not include a quantum meruit claim in its complaint, Antech did include the following general prayer for relief: "Plaintiff Antech Diagnostics, Inc. hereby respectfully requests judgment to be entered in its favor and against Defendant Michael Posner, plus costs, interest, attorneys' fees, *and all other such relief as this Honorable Court deems just and proper.*" (DE 1 at 5 (emphasis added)). At least one Circuit Court of Appeals has affirmed the granting of quantum meruit relief under similar circumstances, and in doing so expressly upheld the constitutionality of Federal Rule of Civil Procedure 54. *See Michael Del Balso, Inc.,*

*v. Carozza*, 136 F.2d 280 (D.C. Cir. 1943) (where employee was to receive share of profits from sewer construction project as compensation for his services but employer wrongfully terminated employment before completion of sewer project and no profits accrued in completion of the project, the employee was properly allowed to recover on basis of quantum meruit under prayer for general relief).[1]

**Conclusion.** Based on the forgoing, I find that Antech's lack of a specific claim for quantum meruit relief does not constrain my exercise of discretion to render a fair judgment. Accordingly, Posner must pay Antech $13,014.74 for unpaid lab services at PSI pricing and $12,707.00 of principal plus interest for repayment on the loan. Antech is not entitled to lost profits, and neither party is considered prevailing in this matter for purposes of the attorney's fee provisions of the contract.

<u>Services Rendered</u>. The Parties' estimations differ with respect to how much Posner would have been billed had PSI pricing been imposed at the inception of the contract. Posner submits that PSI pricing would have reduced the bill by "as much as 45%" and that "a review by counsel of the invoices submitted" indicates Posner should have been billed only $15,252.93 between July, 1, 2015 and December 2016. (DE 59 at 11). Antech submits that PSI pricing would have resulted in roughly a 30% reduction in the overall billed amount for the same date range. (DE 60 at 6-7). Antech attached an appendix to its closing brief which contains a detailed explanation of the process it used to retroactively apply PSI pricing to the invoices at issue. (DE

---

[1] I recognize that typically, a party will not be given relief not specified in its complaint where the failure to ask for particular relief so prejudices the opposing party that it would be unjust to grant such relief. *See Cooper v. Gen. Am. Life Ins. Co.*, 827 F.3d 729 (8th Cir. 2016). No prejudice will result by my granting Antech equitable relief that it has not expressly sought, as Posner has been made aware of this issue and has had ample opportunity to be heard.

60 at 11-12). Antech's approach seems reasonable and its calculations appear to be accurate. Therefore I conclude that Posner would have been billed a total of $20,188.41 if he had been subject to PSI pricing from the beginning.[2] My independent review of the invoices indicates that Posner made payments totaling $7,173.67. He is entitled to credit for this amount, and so the total owed for services rendered is **$13,014.74.**[3]

Loan. Posner must partially repay the $15,000.00 loan, plus 7% interest accrued pursuant to the terms of the contract. Posner is entitled to forgiveness of the annual loan payment for Year One of the contract ($3,193.00), because he satisfied the annual minimum fee obligation for that year. Therefore, Posner is obligated to re-pay $11,807.00, plus interest. Antech submits that it is entitled to accrued interest through July 1, 2017 (DE 60 at 7), therefore according to the schedule set forth in the ELSA (DE 53-1 at 8), and after taking into account the interest amount to be forgiven, Posner must pay an additional $900.00. The total due for loan repayment is therefore **$12,707.00.**

Lost Profits. Antech failed to perform under the ELSA by declining to honor PSI pricing terms. Antech subsequently ended the contractual relationship with Posner altogether when it stopped servicing Posner. Accordingly, I reject Antech's claim for lost profits.

Attorney's Fees. Antech argues that it is entitled to attorneys' fees under the terms of the ELSA, which provides that "[if] any party commences any proceedings with respect to this Agreement the prevailing party in such litigation or other proceeding shall be entitled to recover

---

[2] Due to a missing invoice, Posner is not obligated to pay for any services Antech may have rendered to Posner's veterinary practice during the month of November 2015.

[3] I decline to award $2,603.97 in service charges which Antech argues should apply, given that these charges were imposed at least in part based upon Antech's overbilling, which resulted in Posner's decision to refuse payment and thereby incur those charges.

14

from the other party all costs of the proceedings, including reasonable costs, attorney fees, professional fees and other expenses incurred by such prevailing party in such proceedings." (DE 60 at 8). Antech relies on a similar attorney fee provision relating to the $15,000 promissory note.

I decline to award attorney's fees here because I do not believe either party should be considered "prevailing." Antech breached the ELSA by refusing to honor PSI pricing and then unilaterally terminated the contractual relationship. Nonetheless it is entitled to some damages as a matter of equity, albeit not much as it claims it is owed. Posner refused to pay Antech even the PSI prices for services rendered which he acknowledged he owed. He is liable to Antech for those services rendered, despite that he succeeded in persuading the court that his version of events regarding the formation of the contract and his entitlement to PSI pricing was credible. Thus, neither party truly prevailed for purposes of entitlement to attorney's fees.

Based upon the above findings of fact and conclusions of law, it is the judgment of the court that Antech failed to establish its breach of contract claim against Posner, however Antech is entitled to equitable damages in the amount of $25,721.74. Final judgment will be entered by separate Order.

**DONE AND ORDERED** in Chambers, at West Palm Beach, Florida, this 21 day of May, 2018.

_____
DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to: Counsel of Record

15